1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

6

7  ANDREA SEBERSON,

8                  Plaintiff,                    Case No.

9  v.                                            **CLASS ACTION COMPLAINT**

10  AMAZON.COM, INC.,                            **JURY TRIAL DEMANDED**

11                  Defendant.

12       Plaintiff Andrea Seberson brings this Complaint against Defendant Amazon.com, Inc.

13  ("Amazon" or "Defendant"), on behalf of herself and all others similarly situated, based upon

14  personal knowledge and upon information, investigation, and belief of counsel.

15                          **<u>INTRODUCTION</u>**

16       1.      This case is about a betrayal of trust. Since its inception in 1994 as an online

17  bookseller operating out of founder Jeff Bezos's garage, Amazon—today a tech behemoth worth

18  $1.77 trillion[1]—has cultivated a relationship with consumers that has garnered the company

19  "astounding" customer loyalty.[2] Ultimately, however, Amazon's nominal mission of "striv[ing] to

20  offer … customers the lowest possible prices, the best available selection, and the utmost

21

22  [1] *Amazon Net Worth 2006–2021 | AMZN*, MACROTRENDS (last visited July 6, 2021),
   https://www.macrotrends.net/stocks/charts/AMZN/amazon/net-worth.
23  [2] Pamela N. Danzinger, *Amazon's Astounding Customer Loyalty Is Astounding*, FORBES (Jan. 10,
   2018), https://www.forbes.com/sites/pamdanziger/2018/01/10/amazons-customer-loyalty-is-
24  astounding/?sh=f42c81511fe3.

25
                                                    TERRELL MARSHALL LAW GROUP PLLC
                                                         936 North 34th Street, Suite 300
                                                          Seattle, Washington 98103-8869
    CLASS ACTION COMPLAINT - 1                       TEL. 206.816.6603 • FAX 206.319.5450
                                                            www.terrellmarshall.com

convenience" came into direct conflict with Amazon's ambition to dominate every sector of the economy. Faced with a choice between doing right by its customers or gaining market power in one of the many industries it seeks to control, Amazon made the wrong choice, jettisoning its promise of the "lowest possible prices" and violating the antitrust laws in a way that has injured—and continues to injure—hundreds of millions of its loyal customers.

2.     To understand how and why Amazon broke the antitrust laws and betrayed the trust of its customers, one must begin with Amazon Prime, the company's first ever membership program, unveiled in February 2005.[3] At the program's inception, an annual membership fee of $79 provided Prime members with unlimited two-day shipping at no extra cost and one-day shipping for $3.99 per item.[4]

3.     Amazon CEO Jeff Bezos touted Prime as "all-you-can-eat express shipping."[5] At the time, Amazon's annual revenues were $8.49 billion[6]—only 2.2% of what they are today. Bezos assured investors that, "[t]hough expensive for the Company in the short-term," Prime would pay off in the long-run because "it's a significant benefit and more convenient for customers. With Amazon Prime, there's no minimum purchase to think about, and no consolidating orders—two-day shipping becomes an everyday experience rather than an occasional indulgence."[7]

4.     Since its inception, Amazon Prime has been "the linchpin of [the company's] growth strategy," playing a large part in Amazon's attaining control of about 65% to 70% of all

---

[3] *Amazon.com Announces Record Free Cash Flow Fueled by Lower Prices and Free Shipping; Introduces New Express Shipping Program – Amazon Prime*, BUSINESS WIRE (Feb. 2, 2005) (accessed via LEXISNEXIS).
[4] *Id.*
[5] *Id.* (internal quotation marks omitted).
[6] Laurie J. Flynn, *In a Well-Worked Pattern, Amazon's Revenue Rises and Its Profit Drops*, NY TIMES, at C4 (Feb. 2, 2007) (accessed via LEXISNEXIS).
[7] *Id.* (internal quotation marks omitted).

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

online marketplace sales in the United States,[8] and resulting in singular customer loyalty from Prime members,[9] of which there are currently more than 140 million in the United States.[10] The loyalty of Amazon customers is astounding: 96% of Prime members are more likely to buy products from Amazon than from other online retailers, and 89% of consumers who are *not* Prime members are more likely to make a purchase on Amazon.com than on any other e-commerce website.[11]

    5.    The "Prime Badge," which appears next to products on Amazon's website that are eligible for free, fast shipping to Prime members, conveys a powerful message to the 142.5 million American consumers who currently pay $12.99 per month for Prime membership: "Trust us. It's authentic. It will get to your doorstep quickly, at no extra charge. You can buy it with a click."[12]

---

[8] *Investigation of Competition in Digital Markets*, Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, at 255 (Oct. 6, 2020) [hereinafter House Subcommittee Report], *available at* https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.
[9] Danzinger, *supra* note 2.
[10] *How Many People Have Amazon Prime*, 99 FIRMS (last visited July 4, 2021), https://99firms.com/blog/how-many-people-have-amazon-prime.
[11] Kiri Masters, *89% Of Consumers Are More Likely To Buy Products From Amazon Than Other E-Commerce Sites: Study*, FORBES (Mar. 20, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/?sh=6471bf5b4af1.
[12] Ron Knox & Shaoul Sussman, *How Amazon Used the Pandemic to Amass More Monopoly Power*, THE NATION (June 26, 2020), https://www.thenation.com/article/politics/amazon-bezos-pandemic-monopoly/.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

2

3

4

5

6



7

8      6.      As with traditional brick-and-mortar retail businesses, the biggest factor in running

9  a successful business online is location, location, location. And Amazon has the most valuable

10  online real estate for the millions of Sellers who offer their products through Amazon.com: the

11  "Buy Box," which is the section on the right side of an Amazon product detail page where

12  customers can add a product to their cart or "buy now":

13

14

15

16      

17

18

19

20

21

22

23

24

25

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    7.    The importance of the Buy Box to Sellers is evidenced by the fact that—rather than

2    comparison shopping to see whether another Seller on Amazon's website is offering a better deal

3    on a product—90% of consumer purchases on Amazon's website are made through the Buy Box.[13]

4    This is because consumers trust that the product offer placed in front of them on Amazon.com—

5    namely, the offer in the Buy Box—is the best deal on that product.

6    8.    Unfortunately, Amazon has abused the trust and loyalty of the many millions of

7    Americans for whom the company's website is the first and last stop for purchasing everything

8    from a $19.99 package of baby diapers to a $4,999 digital camera.

9    9.    Amazon expanded, and ultimately entrenched, its dominant market power in online

10   retail by sustaining losses for much of its first 20 years—losses that resulted from the company's

11   strategy of engaging in below-cost pricing to engender extreme customer loyalty and ensure that

12   Amazon would become consumers' one-stop-shop.[14]

13   10.    But Amazon's ambitions lay far beyond *just* being the largest online retailer in the

14   world. As Amazon's market power in online retail grew, the company branched out to become

15   (among other things) a marketing platform, a delivery and logistics network, a payment service, a

16   credit lender, an auction house, a major book publisher, a producer of television and films, a

17   fashion designer, a hardware manufacturer, and a leading provider of cloud server space and

18   computing power.[15]

19   11.    To drive its aggressive efforts to expand into—and dominate—these and other

20   markets, Amazon leveraged and exploited its most valuable asset: the immense brand loyalty of

21

22

---

23  [13] Leanna Ziebak, *How to Win the Amazon Buy Box in 2021*, TINUITI (Mar. 25, 2020), https://tinuiti.com/blog/amazon/win-amazon-buy-box/.

[14] *See* Lisa M. Khan, *Amazon's Antitrust Paradox*, 126 YALE L.J. 564, 747–53 (2017).

24  [15] Khan, *Amazon's Antitrust Paradox*, *supra* note 14, at 754.

25

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  its customers. In doing so, Amazon both violated the antitrust laws and harmed hundreds of

2  millions of consumers.

3    12. In 2006, just one year after launching its Prime membership program Amazon

4  launched Fulfillment by Amazon ("Fulfillment services" or "FBA"), a logistics service that

5  provides warehousing, packing, and shipping to third-party sellers ("Sellers"), who account for

6  over 50% of the items purchased through Amazon.com.[16]

7    13. From the inception of its Fulfillment services, Amazon's goal was to dominate the

8  $1.5 trillion-per-year shipping and logistics industry. Unlike e-commerce, however, the "logistics

9  [industry was] filled with worthy competitors that ha[d] dominated the industry for a century"—

10  FedEx, UPS, and the U.S. Postal Service.[17]

11    14. The question for Amazon was how to quickly gain customers for its Fulfillment

12  services so that it could rapidly expand its logistics footprint.

13    15. The company's answer to this question is emblematic of its ruthless and

14  anticompetitive business strategy: Amazon decided to simply force Sellers to purchase its

15  Fulfillment services.

16    16. This strategy was viable because of the immense power that Amazon has over

17  Sellers. Of the 2.3 million active third-party Sellers from around the world, about 37%—or

18  850,000—of Sellers "rely on Amazon as their sole source of income."[18]

19

20

---

21  [16] Tugba Sabanoglu, *Percentage of paid units sold by third-party sellers on Amazon platform as of 1st quarter 2021*, STATISTA (May 7, 2021), https://www.statista.com/statistics/259782/third-
22  party-seller-share-of-amazon-platform/.
[17] Erica Pandey, *The race to dominate the $1.5 trillion business of moving stuff*, AXIOS (May 17, 2019), https://www.axios.com/amazon-race-dominate-logistics-shipping-ups-fedex-dhl-
23  b652dbf0-abef-4505-9630-1107fdacb535.html.
24  [18] House Subcommittee Report, *supra* note 8, at 249.

25

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

17.     The company's power over Sellers stems from its complete control over whether a Seller's product is even *shown* to an Amazon shopper.

18.     Amazon exercises this control through the Buy Box: products offered by sellers with a Prime Badge are placed higher in Amazon's search results and are generally the *only* products featured in the Buy Box, through which 90% of consumer purchases on Amazon.com are made.

19.     To force Sellers to switch to its Fulfillment services, Amazon conditioned a Seller's access to the Prime Badge—and with it, placement in the Buy Box—on a Seller's purchasing Fulfillment by Amazon.

20.     As documented in a report resulting from a year-long investigation by a U.S. House Subcommittee ("House Subcommittee Report"), Sellers need a Prime Badge to "maintain a favorable search result position, to reach Amazon's more than 112 million Prime members, and to win the Buy Box,"[19] and purchasing "FBA is functionally the ***only*** way for sellers to get the Prime Badge for their product listings."[20]

21.     In other words, Amazon has forced Sellers to buy its Fulfillment services by designing its Buy Box algorithm so that "[t]he variable that has the greatest impact on the Buy Box is the product's fulfillment method. Since Amazon considers its fulfillment service to have perfect metrics across variables, using Fulfillment By Amazon (FBA) is the easiest way to increase your chances of winning the Buy Box."[21]

---

[19] House Subcommittee Report, *supra* note 8, at 288.
[20] House Subcommittee Report, *supra* note 8, at 287 (emphasis added).
[21] Eyal Lanxner, *The Amazon Buy Box: How It Works for Sellers, and Why It's So Important*, BIGCOMMERCE (last visited Mar. 15, 2021), https://www.bigcommerce.com/blog/win-amazon-buy-box/.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

22.     Thus, if two Sellers—one of whom pays for Amazon's Fulfillment services while the other doesn't—offer the same product on Amazon.com, the Seller who pays Amazon for Fulfillment services will "win" the Buy Box and make the sale, even if the competing Seller offers a lower total price and faster, more reliable shipping.

23.     In antitrust terms, Amazon's forcing Sellers into purchasing its Fulfillment services constitutes an unlawful "tying arrangement." Placement in the Buy Box is the "tying" product or service and Sellers are the "buyers."[22] Access to the Buy Box is completely controlled by Amazon, and Amazon's algorithm assures that only products with the Prime Badge are offered through the Buy Box. Fulfillment by Amazon is the "tied" product or service, which Sellers must purchase to obtain access to the Buy Box. In short, "Amazon is tying the outcomes it generates for sellers using its retail platform to whether they also use its delivery business."[23]

24.     Amazon's anticompetitive conduct harms Sellers because it permits Amazon to charge "increased fees for compulsory fulfillment … services."[24] As one Seller reported in a letter sent to federal lawmakers in 2019, "Amazon raised logistics fees by 20% over the [previous] four years until they cost as much as *35% more* than competing services."[25]

25.     Amazon's violation of the antitrust laws also has injured and continues to injure Plaintiff and Class Members, who pay higher prices when shopping on Amazon.com than they would but for Amazon's unlawful conduct. The higher prices inflicted on Plaintiff and other consumers are a predictable and well-documented direct effect of Amazon's anticompetitive

---

[22] Technically, Amazon is limiting access to the Prime Badge. But the Prime Badge is what gains a Seller access to the Buy Box, where the sale is made.

[23] Khan, *Amazon's Antitrust Paradox*, *supra* note 14, at 779.

[24] House Subcommittee Report, *supra* note 8, at 292.

[25] Spencer Soper, *Amazon Accused of Forcing Up Prices in Antitrust Complaint*, BLOOMBERG NEWS (Nov. 8, 2019) (emphasis added), https://www.bloomberg.com/news/articles/2019-11-08/amazon-merchant-lays-out-antitrust-case-in-letter-to-congress.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

conduct—one that is known to Amazon and Sellers, but is hidden from Amazon's hundreds of millions of loyal customers.

26.     Amazon's anticompetitive conduct directly leads to higher prices for Amazon.com shoppers through several mechanisms.

27.     First, the algorithm that is the linchpin of Amazon's unlawful scheme gives the coveted Buy Box placement (the tying product) to products sold by Amazon and Sellers who use its Fulfillment services (the tied product), even when the identical product is offered for a lower total price and faster shipping by a Seller who controls its own handling and shipping—a practice that Amazon refers to as "Fulfillment by Merchant" or "FBM."

28.     Because "[m]ost Amazon shoppers end up clicking 'add to cart' for the offer highlighted in the buy box"—again, 90% of purchases on Amazon.com are made through the Buy Box—consumers pay more than they would have absent Amazon's anticompetitive scheme to leverage its power over e-commerce to conquer the logistics market.

29.     Amazon's manipulative pricing is well documented. For example, a 2016 investigation by ProPublica tracked "250 frequently purchased products [on Amazon.com] over several weeks," and found that "[a]bout three-quarters of the time, Amazon placed its own products and those of companies that pay for its services in [the Buy Box] ***even when there were substantially cheaper offers available from others***."[26]

30.     Second, because an offer from a Seller who pays for Fulfillment by Amazon "wins" the Buy Box over an offer from a non-FBA Seller who offers the identical product for a lower price and with faster delivery, price competition among third-party Sellers on Amazon.com is

---

[26] Julia Angwin & Surya Mattu, *Amazon Says It Puts Customers First. But Its Pricing Algorithm Doesn't*, PROPUBLICA (Sept. 20, 2016) (emphasis added), https://www.propublica.org/article/amazon-says-it-puts-customers-first-but-its-pricing-algorithm-doesnt.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

greatly reduced. With the price competition among Sellers most likely to be featured in the Buy Box significantly diminished, items in the Buy Box are priced higher than they would be but for Amazon's anticompetitive scheme. And because 90% of purchases on Amazon.com are made through the Buy Box, consumers pay higher prices than they would have absent Amazon's market manipulation.

31.   Third, Amazon charges more for Fulfillment by Amazon than its competitors in the logistics industry do for comparable services,[27] and Sellers pass on a significant portion of this extra cost to consumers in order to meet their margins. As one Seller reported to federal lawmakers, using "Amazon's [Fulfillment] service forced him to boost prices by as much as 12% on more than 100 products he's been selling on Amazon for years."[28]

32.   Fourth, since many items on Amazon's website are sold by both Amazon and its Sellers, the higher prices charged by Sellers who use Amazon's Fulfillment services enable Amazon to price its products higher than it otherwise would have because its primary competitors—the Sellers on its platform—are charging higher prices as a result of Amazon's unlawful leveraging of its market power in e-commerce to take over the logistics market.

33.   Amazon is profiting handsomely from its unlawful tying scheme. Because a Seller's revenues are directly tied to their purchasing Fulfillment by Amazon (effectively a prerequisite for a Seller to appear in the Buy Box), Amazon can and does charge Sellers supra-competitive prices for its Fulfillment services. And since Amazon's unlawful conduct causes Sellers to increase prices, Amazon collects higher "referral fees"—in most cases, a percentage of

---

[27] *See, e.g.*, Soper, *Amazon Accused of Forcing Up Prices*, *supra* note 25 ("The merchant's letter says Amazon raised logistics fees by 20% over the past four years until they cost as much as 35% more than competing services.").

[28] Soper, *Amazon Accused of Forcing Up Prices*, *supra* note 25.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

the total sales price[29]—from Sellers. In addition, the higher prices that Sellers must charge to pay for Fulfillment services and meet their margins allow Amazon to charge higher prices than it would but for its unlawful conduct.

34. The economic harm that Amazon's scheme has inflicted on consumers is difficult to overstate. Approximately $197 billion in products was sold *by Amazon alone* through Amazon's website in 2020.[30] This does not include the products sold by Sellers, who in 2020 accounted for 52% of products sold on Amazon.com.[31]

35. Given that Amazon takes 30% of Sellers' revenues in the form of fees[32] and that these fees garnered the company $80.46 billion dollars in U.S. sales in 2020,[33] consumers purchase approximately $268 billion from third-party Sellers through Amazon.com last year.[34] This brings the total that shoppers spent on Amazon.com in 2020 to approximately $465 billion—the $197 billion spent on products sold by Amazon plus the $268 billion spent on products sold by Sellers.

---

[29] In most cases, the referral fees that Amazon collects from Sellers are a percentage of the total sales price. *See Selling on Amazon Fee Schedule*, AMAZON (last visited June 29, 2021), https://sellercentral.amazon.com/gp/help/external/200336920.

[30] Amazon.com, Inc. Form 10-K for Fiscal Year Ending on December 31, 2020.

[31] Fareeha Ali, *What percentage of products on Amazon are sold by marketplace sellers?*, DIGITAL COMMERCE 360 (Apr. 29, 2021), https://www.digitalcommerce360.com/2021/04/29/what-percentage-of-products-on-amazon-are-sold-by-marketplace-sellers/.

[32] Stacy Mitchell, Ron Know & Zach Freed, *Amazon's Monopoly Tollbooth* 3, INSTITUTE FOR LOCAL SELF-RELIANCE (July 2020), *available at* https://ilsr.org/wp-content/uploads/2020/07/ILSR_Report_AmazonTollbooth_Final.pdf.

[33] Daniela Coppola, *Annual net revenue of Amazon from 2006 to 2020, by segment*, STATISTA (July 7, 2021), https://www.statista.com/statistics/266289/net-revenue-of-amazon-by-region/.

[34] $80.46 billion ÷ 0.30 = $268.2 billion.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

36.     Amazon has forced the vast majority of Sellers to purchase its Fulfillment services. As a result, 73% of all Sellers now use Fulfillment by Amazon.[35] The Buy Box, through which 90% of purchases on Amazon.com are made, presents consumers with offers from Amazon or FBA Sellers.

37.     The Seller who complained to federal lawmakers reported as much as a 12% increase in his prices as a result of Amazon's unlawful conduct. Assuming that, but for Amazon's anticompetitive conduct, the prices of items purchased through the Buy Box were on average higher by even a tenth of what this Seller reported (i.e., 1.2% higher)—a conservative estimate given that Amazon takes 30% Seller revenues in fees—**Amazon's violations of the antitrust laws overcharged consumers by approximately $5 billion in 2020 alone**, and billions of dollars more over the preceding years.

38.     Amazon's leveraging of its market power in e-commerce to attain dominance in the logistics market violates both Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).

39.     Amazon's tying arrangement is a *per se* violation of Section 1 of the Sherman Act because Amazon has significant—indeed, monopoly-level—power over the Prime Badge, the Buy Box, and e-commerce generally, and Amazon uses that power to force Sellers into purchasing Amazon's Fulfillment services.

40.     Amazon's conduct also violates Section 2 of the Sherman Act because (i) Amazon has monopoly-level power in several markets—the U.S. online retail-goods market and the market for favorable Seller placement on the Amazon website (i.e., the granting of the Prime badge, which garners higher placement in search results and access to the Buy Box)—and (ii) Amazon has used

---

[35] House Subcommittee Report, *supra* note 8, at 288, 290 (stating that 73% of all Sellers use Amazon's Fulfillment services, even though many Sellers would prefer to use other logistics companies to warehouse, package, and ship their products).

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  that monopoly-level power to foreclose competition, to gain advantage, and to destroy competitors

2  in the market for the warehousing, packing, and shipping of retail goods to consumers.

3       41.     In sum, Amazon's unlawful use of its monopoly-level power has given it an edge

4  in the logistics market, forced Sellers to pay supra-competitive prices for Fulfillment services, and

5  increased prices for Plaintiff and other consumers who shop on Amazon.com. Amazon's unlawful

6  tying scheme harms hundreds of thousands of businesses and hundreds of millions of consumers.

7  The only winner is Amazon, which earns billions as a result of its uncompetitive conduct while

8  continuing to gain economic power in all markets it enters.

9  **PARTIES**

10       42.     Plaintiff Andrea Seberson is a natural person and a citizen of the State of Minnesota,

11  Hennepin County. During the relevant time period, Ms. Seberson made numerous purchases

12  through Amazon.com, almost exclusively through the Buy Box. Ms. Seberson was injured by

13  Amazon because, as a direct result of Amazon's anticompetitive actions, she was overcharged for

14  the numerous items she purchased through the Buy Box.

15       43.     Defendant Amazon.com, Inc. is a Delaware corporation with a principal place of

16  business at 410 Terry Avenue North, Seattle, Washington 98109-5210. At all relevant times,

17  Amazon advertised, marketed, promoted, offered for sale, and sold goods throughout the United

18  States, including in this District.

19  **JURISDICTION AND VENUE**

20       44.     This action arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2),

21  Section 4 of the Clayton Act (15 U.S.C. § 15(a)), and Section 16 of the Clayton Act (15 U.S.C.

22  § 26). Plaintiff seeks damages for her injuries, as well as for injuries suffered by Class Members,

23  resulting from Amazon's anticompetitive conduct. Plaintiff also seeks an injunction to prohibit

24

25

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Amazon from continuing its unlawful conduct. This Court has subject matter jurisdiction under

2  28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity), 28 U.S.C. § 1337(a) (antitrust),

3  and 15 U.S.C. § 15 (antitrust).

4      45.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because

5  Defendant Amazon maintains its corporate headquarters and principal place of business in this

6  District, transacts business within this District, and carries out interstate trade and commerce in

7  this district. Venue also is appropriate in this District under Section 12 of the Clayton Act, 15

8  U.S.C. § 22 (nationwide venue for antitrust matters).

9                              **FACTUAL ALLEGATIONS**

10 **A.     Unchecked Growth: It's Always Day 1 at Amazon**[36]

11      **1.    Amazon's Prime Strategy of Losing Money to Make Money**

12      46.    Amazon is a behemoth in numerous markets: e-commerce, consumer electronics,

13 television and film production, groceries, cloud services, book publishing, and logistics.[37] In 2020

14 alone, Amazon's revenues were more than $386 billion, from which Amazon reaped a profit

15 of $21.3 billion.[38]

16

17

18

---

19 [36] In his first letter to shareholders in 1997, Jeff Bezos wrote, "this is Day 1 for the Internet and,
   if we execute well, for Amazon.com." Jeff Bezos, *Amazon's original 1997 letter to shareholders*
20 (last visited July 8, 2021), https://www.aboutamazon.com/news/company-news/amazons-
   original-1997-letter-to-shareholders. "Day 1" means "energy and dynamism"—"mak[ing]
21 high-quality, *high-velocity* decisions." Jeff Bezos, *2016 Letter to Shareholders* (last visited
   July 8, 2021), https://www.aboutamazon.com/news/company-news/2016-letter-to-shareholders.
22 In contrast, "Day 2 is stasis. Followed by irrelevance. Followed by excruciating, painful decline.
   Followed by death. And that is why it is always Day 1." *Id.* (internal quotation marks omitted).
23 [37] House Subcommittee Report, *supra* note 8, at 247.
   [38] *Amazon Company Profile*, Fortune 500 (last visited June 29, 2021),
24 https://fortune.com/company/amazon-com/fortune500/.

25
                              **Terrell Marshall Law Group PLLC**
                                           936 North 34th Street, Suite 300
                                             Seattle, Washington 98103-8869
                                        TEL. 206.816.6603 • FAX 206.319.5450
                                               www.terrellmarshall.com
   CLASS ACTION COMPLAINT - 14

47.   As of late 2020, Amazon had a 50% or higher share of U.S. retail e-commerce.[39] Over the past 5 years, Amazon's share of U.S. retail e-commerce has grown an average of 8% per year.[40] If Amazon keeps gaining market share at this rate for the next 5 years—and there is no indication that Amazon's rapacious growth is slowing down—**the company will control 73.5% of the U.S. retail e-commerce market by 2026**.

48.   How is this possible, given that during Amazon's first 20 years in business, Amazon "generated a positive net income in just over half of its financial reporting quarters," and even in the profitable quarters, "its margins were razor-thin"?[41]

49.   As Lisa Khan, now the Chair of the FTC, wrote in her seminal article *Amazon's Antitrust Paradox*, Amazon established its "dominance as an online platform thanks to two elements of its business strategy: [i] a willingness to sustain losses and invest aggressively at the expense of profits, and [ii] integration across multiple business lines."[42]

50.   By 1997, it was clear from Bezos's own statements that "the premise of Amazon's business model was to establish scale," and "[t]o achieve scale, the company prioritized growth":[43]

> **[Interviewer]:** In your prospectus you say, "The Company's view … is that it will incur substantial losses for the foreseeable future."
> **Bezos:** We're not just covering ourselves. We're disclosing the facts of the situation. We're going to be unprofitable for a long time. And that's our strategy.
> **[Interviewer]:** Presumably, at some point you probably don't want to be showing a loss.
> **Bezos:** Long term, the only way companies generate value is by making profits.

[39] House Subcommittee Report, *supra* note 8, at 254.
[40] Stephanie Chevalier, *Projected retail e-commerce GMV share of Amazon in the United States from 2016 to 2021*, STATISTA (July 7, 2021), https://www.statista.com/statistics/788109/amazon-retail-market-share-usa/.
[41] Khan, *Amazon's Antitrust Paradox*, *supra* note 14, at 747.
[42] Khan, *Amazon's Antitrust Paradox*, *supra* note 14, at 746–47.
[43] Khan, *Amazon's Antitrust Paradox*, *supra* note 14, at 749.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

[Interviewer]: Are there things that need to happen for you to reach that point?
**Bezos:** Only one. ***The key thing is sales growth.***
**[Interviewer]: *But your sales must grow faster than what you spend to get them, right?***
**Bezos:** *No, it's not the rate of growth. It's achieving a certain scale*.[44]

51.     As Bezos's statements show, "aggressive investing would be key [to Amazon's success], even if that involved slashing prices or spending billions on expanding capacity, in order to become consumers' one-stop-shop."[45]

52.     Enter Amazon Prime. While the initial benefit of Prime membership was unlimited two-day shipping, since the program's inception in 2006, Amazon has bundled in numerous other benefits, such as special deals and discounts, 2-hour grocery delivery through Whole Foods Market and Amazon Fresh, unlimited streaming of movies and TV shows through Prime Video, access to over two million songs through Prime Music, unlimited photo storage through Amazon Photos, and free two-day delivery and discounts when filling a medication prescription through Amazon Pharmacy.[46]

53.     Amazon did not make money from its Prime program, but the company was "willing to lose hundreds of millions of dollars a year on" Prime "because the service create[d] loyalty to the company."[47] As an Amazon employee who worked on Prime explained: "It was

---

[44] Jeffrey L. Seglin, *Hot strategy: 'Be unprofitable for a long time,'* ABI/INFORM (Sept. 1, 1997) (accessed via LEXISNEXIS) (emphasis added).
[45] Khan, *Amazon's Antitrust Paradox*, *supra* note 14, at 749.
[46] Zoe Malin, *What is Amazon Prime? Membership benefits, prices and more*, NBC NEWS (June 22, 2021), https://www.nbcnews.com/shopping/amazon-prime-day/amazon-prime-benefits-cost-n1269672.
[47] Steve Woo, *Amazon 'Primes' Pump for Loyalty*, WALL STREET JOURNAL (Nov. 14, 2011), https://www.wsj.com/articles/SB10001424052970203503204577036102353359784.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

never about the $79. It was really about changing people's mentality *so they wouldn't shop anywhere else*."[48]

54.     Amazon's strategy of operating the Prime program at a loss paid off, generating extraordinary customer loyalty. One 2020 survey of American consumers found that, despite 24% of respondents "hav[ing] negative feelings about Amazon's impact on the retail industry," 47% of Americans nonetheless "do at least a quarter of their shopping on Amazon," and 23% of respondents "buy more than half of all their goods on the site."[49] Moreover, the survey showed that "[f]ast and free shipping [i.e., Prime shipping] is far and away the top reason people shop at Amazon, selected by 80% of respondents."[50]

55.     Loyalty to Amazon is especially strong among Prime members, who account for the vast majority of sales on Amazon.com.[51] As the House Subcommittee Report found, Prime members are so loyal that they are not sensitive to price increases:

> Once Prime members pay the upfront annual membership fee, they are likely to concentrate their online purchases with Amazon … . As one market participant observed, "Prime members will continue to use Amazon and not switch to competing platforms, *despite higher prices and lower-quality items on Amazon* compared to other marketplaces, *and despite recent increases in the price of a Prime membership*."[52]

---

[48] Khan, *Amazon's Antitrust Paradox*, *supra* note 14, at 752–53 (citation omitted).

[49] *New Consumer Survey from Convey Reveals Mixed Feelings About Amazon – Even As Fast, Free Shipping Proves Irresistible*, BUSINESS WIRE (Feb. 5, 2020) (emphasis added) https://www.businesswire.com/news/home/20200205005457/en/New-Consumer-Survey-from-Convey-Reveals-Mixed-Feelings-About-Amazon-%E2%80%93-Even-As-Fast-Free-Shipping-Proves-Irresistible.

[50] *Id.*

[51] Most people who purchase items through Amazon are Amazon Prime members, *see* Tugba Sabanoglu, *Number of Amazon Prime users in the United States from 2017 to 2022*, STATISTA (Dec. 1, 2020) (showing that there were 142.5 million Prime members in United States in 2020), and Prime members also account for the vast majority of sales through Amazon, "spend[ing] an average of $1,400 annually on Amazon, versus $600 [spent annually by] non-members." House Subcommittee Report, *supra* note 8, at 260.

[52] House Subcommittee Report, *supra* note 8, at 260 (emphasis added);

CLASS ACTION COMPLAINT - 17

56. This is in large part because consumers trust that Amazon is giving them not only the best shipping but also the best price:

> Amazon loyalists shop on Amazon.com trusting that they are getting a bargain. . . . [I]t's this perception of low pricing that helps make shopping on Amazon almost instinctual to many consumers. It's this perception that keeps Amazon shoppers from checking other sites for lower pricing before hitting the "Place Your Order" button. It makes retail shoppers check their Amazon app before heading to the register. It's enough to convince folks to make purchases with just an Alexa voice command or a Dash button-push without concern for how little visibility they have into actual market pricing.[53]

### 2. The Buy Box Trains Consumers to Click Without Thinking

57. Consumers' trust in Amazon extends to the Buy Box.

58. Amazon's e-commerce platforms allows multiple Sellers to offer the same product; in some cases Amazon offers the product as well.[54] The Buy Box enables one-stop single-click shopping, eliminating the need for consumers to comparison shop.

---

[53] Jake Fishman, *Amazon, the Price Perception Leader*, GAP INTELLIGENCE (Sept. 7, 2017), https://www.gapintelligence.com/blog/amazon-com-the-price-perception-leader/.
[54] House Subcommittee Report, *supra* note 8, at 249.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   59.     When a consumer clicks on a link to a product on Amazon's site, the consumer is

2   taken to the product page, and an algorithm controlled by Amazon "chooses a single seller from

3   all the vendors offering that product to display as the featured offer in the 'Buy Box'":[55]

4



11

12   60.     Amazon Marketplace—the market through which third party Sellers offer their

13   goods—"is so well integrated into Amazon.com [that] a lot of customers don't even realize they

14   are [sometimes] purchasing from third party sellers" when they make a purchase through the Buy

15   Box.[56]

16   61.     Because 90% of consumer purchases on Amazon's website are made through the

17   Buy Box,[57] being featured in the Buy Box is extremely important to Sellers:[58]

18

19   [55] House Subcommittee Report, *supra* note 8, at 249.

20   [56] Sophia Spiridakis, *What Is Amazon Marketplace? Everything You Need to Know About the Platform*, SELLER'S CHOICE (Mar. 20, 2020), https://www.sellerschoice.digital/blog/what-amazon-marketplace; *see also* Dave Hamrick, *How to Win the Amazon Buy Box*, JUNGLE SCOUT

21   (Jan. 4, 2021) ("Ultimately, the Buy Box facilitates a low-friction sale on Amazon by enabling shoppers to make their purchase quickly and easily, within just two or three steps. But, what

22   most consumers don't realize is that the Buy Box is separate from the listing itself and sellers compete for ownership of the widget."), https://www.junglescout.com/blog/how-to-win-the-buy-

23   box/.

   [57] Ziebak, *How to Win the Amazon Buy Box in 2021*, *supra* note 13.

24   [58] Ziebak, *How to Win the Amazon Buy Box in 2021*, *supra* note 13.

25

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

CLASS ACTION COMPLAINT - 19

1

2

3

4

> Amazon generates over $250 billion in sales every year. Of those conversions, over 90% occur using Amazon's buy box.
>
> If you want to increase your Amazon sales, winning the buy box on the product detail page is pivotal. Retailers featured on Amazon's buy box sell more products. We all know this.

5

6

7

62.     Another analyst provides a succinct yet comprehensive statement of the value of the Buy Box to Sellers:[59]

8

9

10

11

12

13

14

> **Why is the Buy Box important for Amazon sellers?**
>
> There are two main reasons why you should be concerned about the Buy Box.
>
> 1. Owning the Buy Box increases your chances of making a sale.
>
> Nearly all Amazon purchases are made through the Buy Box, as it is the first 'call to action' shoppers see.
>
> However, even though the Buy Box gives information on who is selling and fulfilling the product, it's unlikely that these factor into a customer's decision to buy.
>
> The convenience of the Buy Box's placement is often enough to generate a sale.
>
> 2. If you own the Buy Box, you can create Amazon PPC ads.
>
> Amazon PPC (pay-per-click) allows sellers to bid on prices of clicks for certain keywords, and sellers who control the Buy Box can create sponsored listings for the product through Amazon PPC.
>
> But, if you do *not* own the Buy Box — even if it is on your own listing — you can't create ads for the product.

15

16

17

18

19

20

21

22

23

24

---

[59] Dave Hamrick, *How to Win the Amazon Buy Box*, *supra* note 56.

25

CLASS ACTION COMPLAINT - 20

63.     The importance of "winning the Buy Box" to a Seller's bottom line cannot be overstated. The advantage to a Seller of their product appearing in the Buy Box is so well known that books have been written on the topic:



64.     Thousands if not millions of blog posts and articles analyze the Buy Box or give Sellers tips on how to win it. A Google search for "how to win the buy box Amazon" yields nearly 200 million results:



TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

CLASS ACTION COMPLAINT - 21

65.     So how does Amazon's algorithm determine which Seller wins the Buy Box?

66.     Amazon represents that, to win the Buy Box, a Seller must (i) "have a Professional selling account"[60] (ii) "[p]rice [its] items competitively," (iii) "[o]ffer faster shipping and free shipping," (iv) "[p]rovide great customer service," and (v) "[k]eep stock available."[61]

67.     Conspicuously missing from Amazon's list is the most important factor for winning the Buy Box: a Seller's paying Amazon for its Fulfillment services.

**B.      Fulfillment by Amazon: How to Win Markets and Influence Sellers**

68.     As stated in the Introduction, from its inception Amazon's aspirations were never constrained to being the largest online book retailer or even the largest retailer. From the beginning, Amazon's goal was to dominate every sector of the U.S. economy.

69.     Amazon's modus operandi for achieving this goal is illustrated by its strategy for building a logistics empire:

(i)     Invest heavily in online retail, operating at a loss to quickly achieve scale.

(ii)    Undercut competitors' prices and offer free shipping through Prime to engender customer loyalty and make Amazon the consumer's one-stop-shop.

(iii)   Once scale and customer loyalty are attained, "leverage[ ] its dominance over online shopping and its captive audience of sellers

---

[60] *Featured Offer eligibility*, AMAZON SELLER CENTRAL (last visited July 7, 2021), https://sellercentral.amazon.com/gp/help/external/200418100?language=en-US&ref=efph_200418100_cont_201687550.

[61] *Becoming the Featured Offer*, AMAZON SELLER CENTRAL (last visited July 7, 2021), https://sellercentral.amazon.com/gp/help/external/help.html?itemID=201687550&language=en-US&ref=efph_201687550_cont_37911.

CLASS ACTION COMPLAINT - 22

to rapidly become a huge player in package delivery" and "finance[ing] the necessary infrastructure on the backs of sellers."[62]

70.    Amazon's business strategy echoes Archimedes' statement that, given the right lever and "a firm place to stand," he could "move the earth."[63]

71.    The first two steps of Amazon's strategy had been implemented by 2006, when Amazon launched Fulfillment by Amazon, its logistics business which provides warehousing, packing, and shipping services.

72.    Amazon touted its Fulfillment services as a boon for both consumers and "small and medium-sized" Sellers:

> "We created Fulfillment by Amazon because it is good for Amazon.com customers, and therefore, great for our third-party sellers," said Joe Walowski, Product Manager, Fulfillment by Amazon. "With membership in Amazon Prime growing every day, more and more Amazon.com customers want a great deal on shipping and to receive their orders quickly. Fulfillment by Amazon makes it possible for sellers to offer Amazon.com customers this convenience."[64]

73.    In the early days of Fulfillment by Amazon, there were indications that some Sellers felt that they were benefiting from Amazon's Fulfillment services.[65]

---

[62] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.
[63] ENCARTA BOOK OF QUOTATIONS 31 (2000).
[64] *Amazon Launches New Services to Help Small and Medium-Sized Businesses Enhance Their Customer Offerings by Accessing Amazon's Order Fulfillment, Customer Service, and Website Functionality*, BUSINESS WIRE (Sept. 19, 2006) (accessed via LEXISNEXIS).
[65] *See generally* Brad Stone, *Sold on eBay, Shipped by Amazon.com*, THE NEW YORK TIMES, at C-1 (Apr. 27, 2007) (accessed via LEXISNEXIS) ("The program has some enthusiastic early customers. Barry Mark, who runs Treebeard Books from his home in Palm Beach County, Fla., buys surplus books and sells them on Amazon and other sites. Since he signed up for Fulfillment by Amazon last September, he says that his sales have jumped more than 30 percent, and a third of the orders that come in are from members of Amazon Prime, the company's premium discount shipping program.").

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

74.     But Sellers' excitement about Amazon's Fulfillment services was short-lived as it became clear that Amazon planned to build its logistics empire on the backs of Sellers in two ways.

75.     First, Amazon conditioned Sellers' ability to obtain a Prime Badge—and with it, the coveted Buy Box placement—on a Sellers' purchasing Amazon's Fulfillment services.

76.     Second, once Sellers were completely reliant on Amazon for logistics, Amazon continually increased the fees that Sellers paid for Fulfillment services in order to fund its expansion in the logistics market.

    1.     **Amazon ties Sellers' access to the Buy Box on their paying Amazon for its Fulfillment services.**

77.     Amazon's tying scheme—expanding its logistics business by forcing Sellers to pay for Fulfillment by Amazon as a condition of gaining access to the Buy Box—has long been known to industry insiders and analysts, but consumers have for the most part remained in the dark.

78.     The tie between a Seller's offer being listed in the Buy Box (which requires that the Seller have a Prime Badge) and Fulfillment by Amazon also is well known to lawmakers. As the House Subcommittee Report puts it:

> There is a strong link between Amazon Marketplace and Fulfillment by Amazon (FBA), Amazon's paid logistics service. Amazon uses its dominance in each of these markets to strengthen and reinforce its position in the other.
>
> Amazon's FBA program combines warehousing, packing, and shipping services, and most importantly, access to Prime customers.
>
> …
>
> FBA is functionally the ***only*** way for sellers to get the Prime Badge for their product listings.[66]

---

[66] House Subcommittee Report, *supra* note 8, at 287 (emphasis added).

CLASS ACTION COMPLAINT - 24

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

79.     Numerous articles and blog posts (some by Sellers themselves) provide support for the House Subcommittee Report's conclusion that Amazon exercises its market power in e-commerce to force Sellers to pay for its Fulfillment services:

(i)   "The variable that has the greatest impact on the Buy Box is the product's fulfillment method. Since Amazon considers its fulfillment service to have perfect metrics across variables, using Fulfillment By Amazon (FBA) is the easiest way to increase your chances of winning the Buy Box."[67]

(ii)  "Amazon favours FBA sellers, by making it easier to win the buy box if you use their distribution network."[68]

(iii) "The simplest way to sell on Amazon Prime is to join Amazon FBA, a highly automated and powerful fulfillment network. You send your product inventory to Amazon, and they store it in their warehouses. When a customer places an order through your listing, Amazon picks it, packs it, and ships it. Once your products are in FBA, they automatically get the Prime Badge."[69]

(iv)  "When you're FBM [fulfilled by merchant], you're not eligible for the Amazon Prime Badge, which is tied directly to Amazon's organic ranking algorithm."[70]

(v)   "The easiest way to sell Amazon Prime is to use FBA as your fulfillment method. Regardless of your business model, by joining Amazon as an FBA seller your products will automatically be considered for Amazon Prime. … From a ready-to-buy customer base to an increased chance of winning the Buy Box, there are many benefits to selling Amazon Prime."[71]

80.     The 2020 House Subcommittee Report presents further compelling evidence that Sellers were coerced by Amazon into purchasing Fulfillment services to gain access to the Buy

---

[67] Lanxner, *The Amazon Buy Box*, *supra* note 21.
[68] *Hacking the Buy Box – Understanding Amazon's Buy Box Eligibility & Algorithm*, MUSEMINDED (Dec. 3, 2019), https://museminded.com/how-to-win-the-amazon-buy-box/.
[69] Michael Burns, *How to Sell on Amazon Prime: 3 Ways to Get the Prime Badge*, WEBRETAILER (Apr. 29, 2020) (emphasis added), https://www.webretailer.com/b/how-to-sell-on-amazon-prime/.
[70] Nick Cotter, *Amazon FBM and Seller Fulfilled Prime (SFP): How-to Guide*, TINUITI (June 16, 2020), https://tinuiti.com/blog/amazon/amazon-fbm/.
[71] Regan McPhee, *How to sell on Amazon Prime in 2021*, JUNGLESCOUT (May 27, 2020), https://www.junglescout.com/blog/how-to-sell-on-amazon-prime/.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Box, even when the Sellers found Amazon's Fulfillment services to be of *lower quality* than the warehousing, packing, and shipping services offered by competitors:

(i) "One third-party seller provided the Subcommittee with anecdotal evidence that Amazon favors sellers who participate in Amazon's fulfillment program over sellers who do not. The seller set up an experiment where he sold the same product, one self-fulfilled and the other fulfilled through FBA, and ran different test cases. The seller found that 'Even when the consumer price of the self-fulfilled order was reduced and sold for a lower price (7% lower) than the FBA offer, the FBA still "won" the "Buy Box."' The seller indicated that, without this favorable treatment for FBA, they would not choose to use FBA, as they found **Amazon's fulfillment service was often slower and less reliable than self-fulfillment**."[72]

(ii) "One third-party seller told Subcommittee staff, 'We use both FBA and self-fulfillment, **all of our negative comments are on items shipped through FBA**.'"[73]

(iii) "A competing online marketplace described how Amazon effectively forcing sellers into its FBA program makes it more difficult to compete with Amazon for sellers … . It … explained that because of Amazon's dominance in online commerce, 'Even sellers who sell on other marketplaces are pushed into FBA, because it is the only practicable way to obtain sales on the Amazon marketplace.'"[74]

81. During his July 2020 testimony before the House Subcommittee, Amazon's CEO Jeff Bezos all but admitted that placement in the Buy Box is tied to a Sellers' purchase of Amazon's Fulfillment services:

Rep. Scanlon: "Okay, so we've got fulfillment by Amazon. And a year ago, we asked whether a merchant who was enrolled in Fulfillment By Amazon, also known as FBA, is a factor in whether they can be awarded the Buy Box. And at that time, Amazon said no. But the evidence is indicating, and your own documents are showing, that being enrolled in that program is a major factor, and **it effectively forces sellers to pay for fulfillment services from Amazon if they want to make sales**. Mr. Bezos, has Amazon's Buy Box algorithm ever favored third party sellers who buy fulfillment services from Amazon over other sellers?"

---

[72] House Subcommittee Report, *supra* note 8, at 289–90.
[73] House Subcommittee Report, *supra* note 8, at 290.
[74] House Subcommittee Report, *supra* note 8, at 290.

CLASS ACTION COMPLAINT - 26

1
2
Jeff Bezos: **"**I think effectively the Buy Box, directly or indirectly, I'm not sure if it's direct, but indirectly, **I think the Buy Box does favor products that can be shipped with Prime**."[75]

3
82.    Indeed, before its unlawful practices came under scrutiny, Amazon openly touted

4
the fact that purchasing Fulfillment services from Amazon gave Sellers an advantage. From

5
February 2013 through December 2015, Amazon proudly proclaimed on its website: "Because

6
most FBA listings are ranked without a shipping cost, you get an edge when competing!"[76]

7
83.    Amazon's anticompetitive tying scheme to force Sellers to pay for its Fulfillment

8
services has been wildly successful: approximately 85% of the top 10,000 Amazon Sellers—and

9
73% of Sellers worldwide—use FBA.[77]

10
11
**2.    Amazon's Seller Fulfilled Prime program illustrates the company's anticompetitive double standard.**

12
84.    In 2015, Amazon did introduce an ostensible way for Sellers to gain access to the

13
Buy Box *without* paying for Fulfillment by Amazon. The company called the program "Seller

14
Fulfilled Prime," but the program turned out to be no more than a fig leaf that failed to conceal

15
Amazon's scheme from Sellers and regulators.

16
85.    Nominally, Seller Fulfilled Prime gave Sellers a chance to obtain a Prime Badge

17
and access to the Buy Box *without* paying for Fulfillment by Amazon.[78]

18
86.    Practically, however, "only a very small percentage of sellers could meet the

19
onerous eligibility requirements for Seller Fulfilled Prime."[79] Those eligibility requirements

20
21
[75] *Big Tech Antitrust Hearing Full Transcript July 29*, REV (July 29, 2020) (emphasis added), https://www.rev.com/blog/transcripts/big-tech-antitrust-hearing-full-transcript-july-29.

22
[76] Angwin & Mattu, *Amazon Says It Puts Customers First*, *supra* note 26 (internal quotation marks omitted).

[77] House Subcommittee Report, *supra* note 8, at 288, 290.

23
[78] Andrew Foot, *FBA vs FBM: Should You Opt for Amazon Fulfillment Services or Use Your Own Resources?*, NEWSTEX BLOG (Nov. 1, 2019) (accessed via LEXISNEXIS).

24
[79] House Subcommittee Report, *supra* note 8, at 287.

25
**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

CLASS ACTION COMPLAINT - 27

1  include, among other things (i) that "99% of orders must be shipped on time and less than 0.5%

2  cancelled,"[80] and (ii) "an on-time delivery rate of 98.5 percent."[81]

3       87.    These requirements are so stringent that ***Amazon itself was incapable of***

4  ***achieving them***. The share of packages purchased directly from Amazon that were not delivered

5  on time went from 4.6% in 2017 to 8.6% in 2018 to an astounding **16.6% in 2018**.[82]

6       88.    Thus, it was evident from its inception that Seller Fulfilled Prime was an

7  anticompetitive sham. In addition to Amazon being unable to meet the criteria it established for

8  Sellers, Amazon threatened to revoke the Prime status of some Sellers who used Seller Fulfilled

9  Prime "unless they switched from buying postage from the U.S. Postal Service to buying it from

10  Amazon, often at higher rates."[83]

11       89.    In February 2019, "Amazon stopped allowing new sellers to sign up" for Seller

12  Fulfilled Prime.[84]

13       **3.**     **Amazon taxes Sellers to fund the rapid expansion of its logistics business.**

14       90.    Because Sellers' access to the Buy Box is conditioned on their purchasing

15  Amazon's Fulfillment services, Amazon is able to charge Sellers supra-competitive fees for

16  Fulfillment by Amazon. These fees operate as a tax that Amazon uses to fund its foray into the

17  logistics industry and to cover losses in its other parts of its business.

18

19

20

---

[80] Foot, *FBA vs FBM*, *supra* note 78.

21  [81] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.

22  [82] Rachel Premack, *Amazon is moving away from the USPS and UPS for its in-house delivery network — but the 'sloppier' system may be delaying your packages (AMZN, UPS)*, BUSINESS INSIDER (July 3, 2019), https://markets.businessinsider.com/news/stocks/amazon-late-packages-

23  compared-to-fedex-ups-usps-shipping-2019-7.

[83] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.

24  [84] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.

25

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

91.     As one logistics consultant explained, the only reason for a Seller to pay for Amazon's Fulfillment services is because they are being coerced to do so:

> On a dollars and cents side, [Fulfillment by Amazon is] not that competitive. … I'd recommend Amazon if they were really good on price, but they're not. If it weren't for the algorithm, if it weren't for the fifty-plus pressure points that Amazon is placing on the business, FBA wouldn't be attractive.[85]

92.     Amazon's power in the e-commerce market has allowed it to sharply raise the fees for its Fulfillment services over time. The company's revenues from its logistics business grew from approximately $3 billion in 2014 to $29 in 2019.[86]

93.     The increase in revenue from Amazon's Fulfillment services is primarily driven by the steep increase in the fees charged by the company, not an increase in the number of Sellers who pay for Fulfillment by Amazon:

> Between 2013 and 2019, the standard rate for storing inventory in Amazon's warehouses during off-peak months rose **67 percent**. For the peak months of October through December, the rate soared by **300 percent**. Storage rates for standard-sized items (those under 20 pounds and within certain dimensions) are now 75 cents per cubic foot per month during the first part of the year and $2.40 during the peak season. **Amazon's storage fees are much higher than those of its competitors**, according to several sources. …
>
> The prices Amazon charges to pack and ship an item have likewise risen. … Prices across the board went up [between 2013 and 2020]. The size of the increase varied widely, but the median increase for an item was 55 percent.[87]

---

[85] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.

[86] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.

[87] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8; *see also* Stacy Mitchell, *Amazon Doesn't Just Want to Dominate the Market – It Wants to Become the Market*, THE NATION (Feb. 15, 2018) (accessed via LEXISNEXIS) (As more third-party sellers have agreed to sign up for these services, Amazon has repeatedly raised its fees, with fulfillment fees rising [in 2018] by as much as 14 percent for standard-size items (and more for oversize goods), on top of similar increases in 2017.").

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

94.     For a wide variety of products, the shipping fees Amazon charges Sellers who use its Fulfillment services increased by more than 100% from 2013 to 2020, and the storage fees increased by **200%** or more during the same period:[88]

| Product | Fulfillment Fees (for shipping 1 item) | | | | Storage Fees (for 1 item stored for 2 months) | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2016 | 2020 | Change 2013-2020 | 2013 | 2016 | 2020 | Change 2013-2020 |
| Athletic shirt | 2.46 | 3.42 | 3.70 | 50% | 0.02 | 0.07 | 0.07 | 250% |
| Baby cot | 7.65 | 8.88 | 10.92 | 43% | 0.66 | 0.99 | 1.05 | 59% |
| Bathroom scale | 4.51 | 5.57 | 6.56 | 45% | 0.19 | 0.52 | 0.58 | 205% |
| Coffee/table book | 3.30 | 3.94 | 6.56 | 99% | 0.08 | 0.23 | 0.25 | 213% |
| Cookware set | 12.21 | 15.51 | 19.28 | 58% | 2.51 | 3.77 | 4.01 | 60% |
| Desk organizer | 2.99 | 4.01 | 4.90 | 64% | 0.12 | 0.31 | 0.35 | 192% |
| Disposable plates | 3.75 | 4.79 | 5.80 | 55% | 0.11 | 0.30 | 0.34 | 209% |
| Doll | 3.37 | 4.40 | 5.80 | 72% | 0.26 | 0.70 | 0.79 | 204% |
| Dry erase board | 6.51 | 10.44 | 13.58 | 109% | 0.61 | 0.91 | 0.97 | 59% |
| Foam mattress | 42.59 | 44.98 | 55.44 | 30% | 9.64 | 25.63 | 28.93 | 200% |
| Football | 3.75 | 4.79 | 6.18 | 65% | 0.30 | 0.80 | 0.90 | 200% |
| Glass jars | 6.41 | 7.52 | 9.22 | 44% | 1.03 | 2.74 | 3.10 | 201% |
| Hammock | 23.97 | 25.87 | 29.31 | 22% | 2.80 | 4.21 | 4.48 | 60% |
| Hardcover book | 1.76 | 2.30 | 4.90 | 178% | 0.01 | 0.03 | 0.04 | 300% |
| Headphones | 2.16 | 2.71 | 5.42 | 151% | 0.18 | 0.48 | 0.55 | 206% |
| Phone case | 1.46 | 1.91 | 3.48 | 138% | 0.02 | 0.05 | 0.06 | 200% |
| Ping-pong table | 191.20 | 197.67 | 203.56 | 6% | 9.66 | 14.53 | 15.45 | 60% |
| Playstation console | 0.00 | 0.00 | 8.08 | n/a | 0.52 | 1.37 | 1.55 | 198% |
| Playstation controller | 1.46 | 1.91 | 3.31 | 127% | 0.03 | 0.08 | 0.09 | 200% |
| Printer | 14.49 | 15.90 | 17.76 | 23% | 1.92 | 2.89 | 3.07 | 60% |
| Roll of packing tape | 2.46 | 3.02 | 3.48 | 41% | 0.02 | 0.04 | 0.05 | 150% |
| Stapler | 2.46 | 3.02 | 3.48 | 41% | 0.01 | 0.03 | 0.04 | 300% |
| Stationary cycle | 111.32 | 117.98 | 193.55 | 74% | 13.75 | 20.70 | 22.01 | 60% |
| Surfboard pads | 4.99 | 6.15 | 8.26 | 66% | 0.06 | 0.15 | 0.17 | 183% |
| Toy cottage | 130.00 | 135.11 | 141.68 | 9% | 21.21 | 31.91 | 33.93 | 60% |
| Toy dump truck | 5.27 | 6.35 | 8.08 | 53% | 0.80 | 2.13 | 2.41 | 201% |
| Trilogy book set | 3.37 | 4.40 | 5.42 | 61% | 0.08 | 0.21 | 0.23 | 188% |
| Yard storage bench | 68.00 | 72.38 | 88.42 | 30% | 8.83 | 13.28 | 14.12 | 60% |
| Median Change, 2013-2020 | | | | 55% | | | | 190% |

---

[88] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 11.

CLASS ACTION COMPLAINT - 30

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

95.     One Seller told federal lawmakers that "[d]espite the slow delivery times, Amazon's logistics fees were **35% higher** than other rapid shipping options offered by UPS and the U.S. Postal Service … ."[89]

96.     Amazon's supra-competitive pricing of its Fulfillment services is consistent with the other fees it charges Sellers—e.g., the referral fees that Amazon collects from Sellers for every item sold through its platform.

97.     From 2015 to 2020, Amazon's "revenue from seller fees [grew] two-and-a-half times as fast as total consumer spending on its site" because "it [was] taking a larger cut of every dollar sellers make on the site."[90] In 2015, Amazon took $19 of every $100 in sales that a Seller made on Amazon.com; by 2020, Amazon's cut had increased to over $30 of every $100 in sales that a Seller made through the platform.[91]

98.     The ever-increasing pressure from Amazon on Sellers' bottom lines led directly to Sellers increasing their prices to make margin. Consumers therefore absorb the supra-competitive fees that Sellers pay to Amazon, including the fees that Sellers pay for Fulfillment services.

99.     Despite all evidence to the contrary, Amazon continues to represent that the purpose of the Buy Box is "[t]o give customers the best possible shopping experience," and that Sellers' placement in the Buy Box is based on "performance-based requirements."[92]

100.    Amazon's actions during the COVID-19 pandemic prove otherwise.

[89] Soper, *Amazon Accused of Forcing Up Prices*, *supra* note 25 (emphasis added).
[90] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 4.
[91] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 4.
[92] *How the Featured Offer works*, AMAZON SELLER CENTRAL (last visited July 7, 2021), https://sellercentral.amazon.com/gp/help/external/37911?language=en-US.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

4.     **COVID-19: Amazon Unmasked**

101.     By placing stress on Amazon's logistics system, the COVID-19 pandemic for the first time gave consumers a clear view of the harms caused by Amazon's exploiting its customers' loyalty to force Sellers to pay for Amazon's logistics services.

102.     As brick-and-mortar stores shuttered and people were directed to shelter in place, millions of Americans turned to Amazon, leading the company's revenues to skyrocket.

103.     But consumers who were used to quick delivery were shocked to find that many of the items they ordered from Amazon didn't arrive for weeks.[93]

104.     Amazon sought to explain the delays by pointing out that it "was inundated with orders to the point that its warehousing and shipping system buckled."[94]

105.     But the main reason for the delays was Amazon's tying scheme, which is reflected in the Buy Box algorithm: "The variable that has the greatest impact on the Buy Box is the product's fulfillment method," and the Buy Box algorithm gives Fulfillment by Amazon a perfect score across all variables, ***regardless of how Amazon's Fulfillment services actually performs against competing logistics methods used by Sellers***.[95]

106.     Amazon's Buy Box algorithm therefore continued to select products offered by Amazon or Sellers who used Amazon's Fulfillment services (the tied product), "[e]ven when it

---

[93] *See* Knox & Shaoul, *How Amazon Used the Pandemic to Amass More Monopoly Power*, *supra* note 12 ("At the height of the pandemic, with many storefronts shuttered over statewide shelter-in-place orders, shoppers who turned en masse to Amazon's ubiquitous online marketplace found many of the products they wanted wouldn't arrive for weeks. For a company 'obsessed' with consumer satisfaction, Amazon Prime was unable to deliver.").
[94] Knox & Shaoul, *How Amazon Used the Pandemic to Amass More Monopoly Power*, *supra* note 12.
[95] Lanxner, *The Amazon Buy Box*, *supra* note 21.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

became clear that Amazon's logistics weren't up to the task, and that sellers on its marketplace could independently get orders to customers faster."[96]

107.    One Seller recounted the drastic steps it had to take to make a sale early in the pandemic despite having shipping times much faster than those available through Amazon's Fulfillment services:

> The manager of a company that sells on Amazon, who spoke on the condition of anonymity due to fear of retaliation, says that during the pandemic, their products in Amazon's fulfillment system saw significant delays; it would be weeks before Amazon could get those products to customers. The company had the same products in its own warehouse that it could deliver to customers in days, not weeks. But in order for shoppers to find those products [which did not appear in the Buy Box], it had to drastically increase the prices of the products stored in Amazon's warehouse, despite the far longer shipping times. Only after jacking up the prices of their "Prime" offers did the company see some increase in sales, albeit still a fraction of their sales last March, the manager says.[97]

108.    Through March 2020, "Amazon was still giving 'Buy Box' preference to offers that were fulfilled by Amazon's own logistics network, ***even if the shipping time was considerably longer (delays were reported of up to a month) and the price was more expensive***."[98]

109.    To avoid fallout from the harm that its anticompetitive Buy Box algorithm was causing consumers, by April 2020 the company temporarily changed the algorithm so that "[o]n

---

[96] Knox & Shaoul, *How Amazon Used the Pandemic to Amass More Monopoly Power*, *supra* note 12.

[97] Knox & Shaoul, *How Amazon Used the Pandemic to Amass More Monopoly Power*, *supra* note 12.

[98] Kiri Masters, *Amazon Gives A Boost To Merchants Who Fulfill Their Own Orders While Warehouses Struggle To Cope With COVID-19 Demand*, FORBES (Mar. 31, 2020), https://www.forbes.com/sites/kirimasters/2020/03/31/amazon-gives-a-boost-to-merchants-who-fulfill-their-own-orders-while-warehouses-struggle-to-cope-with-covid-19-demand/?sh=540e28056e1b.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Fulfilled By Merchant (FBM) offers similar to FBA offers, [Amazon gave] preference to FBM in the algorithm."[99]

110.   One Seller who used both Fulfillment by Amazon and Fulfillment by Merchant described the temporary change to Amazon's Buy Box algorithm as "unprecedented":

> Peter Marlega, director of operations at mobile phone accessory seller Tech Armor, said he too had noticed and adapted to Amazon's buy box algorithm change – in some cases raising the price of an FBA offer so the FB[M] offer would win … .
>
> "This is unprecedented in my experience," said Marlenga, who has been in ecommerce since 2006 and has been using FBA for years. "It's the smart thing for Amazon to do, because they're still getting the sale. We've always done both FBA and FBM listings. But just three weeks ago, even if made my FBM listing 75% of the FBA price, the FBA offer still wins the buy box. I can even offer overnight shipping, but FBA still wins."
>
> The algorithm tweak has significantly improved conversion rates [i.e., the number of page visits that result in a sale], Marlenga said. Prior to the change, if Tech Armor had a product listed through FBA and inventory ran out and its FBM offer won the buy box, the conversion rate would still dip by 50% to 75% … .
>
> "Now in [sic] when we have an FBM offer in the buy box, the conversion rate is only down 10%–20% (from competing Prime offers)," he said. "I imagine shoppers are searching and finding that Prime eligible offers have a 21-plus day lead time and they're coming back to us."[100]

111.   Amazon used the record-breaking revenues and profits generated by the pandemic to scale up its logistics business, "expand[ing] its logistics footprint by 50%" in 2020.[101]

112.   Amazon's reputation as an online retailer would have taken a serious hit during the pandemic but for its decision to temporarily change the Buy Box algorithm to present consumers

---

[99] Mike O'Brien, *Amazon Adjusted Buy Box Algorithm, Rewarding Merchant Fulfilled Orders*, MULTICHANNEL MERCHANT (Apr. 7, 2020), https://multichannelmerchant.com/ecommerce/amazon-adjusted-buy-box-algorithm-rewarding-merchant-fulfilled-orders/.
[100] *Id.*
[101] Katherine Khashimova Long, *Amazon posts record sales and profit, with no slowing expected*, SEATTLE TIMES ONLINE (Feb. 2, 2021) (accessed via LEXISNEXIS).

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

CLASS ACTION COMPLAINT - 34

with offers from Sellers that offered a lower price and faster shipping than Amazon or Sellers who used the company's Fulfillment services.

113.     With its self-inflicted crisis averted, Amazon soon returned to its former Buy Box algorithm, designed to effectuate its tying scheme and prioritize the expansion of Amazon's logistics business over the company's steadfastly loyal consumers.

C.     **Econ 101: How Amazon's Strong-Arming of Sellers Leads Directly to Higher Prices for Consumers**

114.     Amazon's  tying a Seller's access to the Buy Box on the Seller paying for the company's Fulfillment services is unlawful and harmful to Sellers. But Amazon's violation of the antitrust laws also injures consumers by overcharging them for purchases made on Amazon.com in at least four different ways.

1.     <u>**Amazon directs consumers to purchase items from Sellers who use Fulfillment by Amazon, even if a non-FBA Seller is offering the item for a lower total price.**</u>

115.     The Buy Box offers consumers items that are either by Amazon or by Sellers who pay for Fulfillment in the Buy Box, even if the same item is offered by a non-FBA Seller at a lower total price and equivalent (or better) shipping times.

116.     As ProPublica's 2016 investigation found, "[a]bout three-quarters of the time, Amazon placed its own products and those of companies that pay for its services [e.g., Fulfillment by Amazon] in [the Buy Box] ***even when there were substantially cheaper offers available from others***," and "[m]ost Amazon shoppers end up clicking 'add to cart' for the offer highlighted in the buy box."[102]

---

[102] Angwin & Mattu, *Amazon Says It Puts Customers First*, *supra* note 26 (emphasis added).

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1     117.    A comment by a Seller on the Amazon Services Seller Forum echoes ProPublica's

2  findings:

3             Only reason so many overpriced items have actually sold is due to the fact
             the buyer is being duped by amazon.

4             When they force a buy box position to an over priced seller the buyers
             typically did not know and just ASSUMED amazon was operating in good

5             faith and in the buyers best interest. When in fact they were not.[103]

6     118.    Although the majority of Sellers have been forced by Amazon to use Fulfillment

7  by Amazon and therefore have access to the Buy Box, there are still non-FBA Sellers who do not

8  appear in the Buy Box and whose listings give lie to Amazon's representation that the Buy Box

9  offers consumers the best deal.

10     119.    For example, the image below shows that Amazon's offer of $126.85 for a set of

11  kitchen knives won the Buy Box even though a Seller offered the same item for $1.06 less, and

12  both Amazon and the Seller offered free shipping:

---

[103] Seller Skeeter, *Items are priced higher on Amazon than at other retailers*, AMAZON SERVICES SELLER FORUM (Apr. 4, 2019), https://sellercentral.amazon.com/forums/t/items-are-priced-higher-on-amazon-than-at-other-retailers/450662.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

2

3

4

5

6

7

8

9



10

11        120.    The next image is a striking illustration of how Sellers are forced to pay for

12   Amazon's Fulfillment services. Seller PConline365 offers a Dell Inspiron laptop for sale and

13   provides both Fulfillment by Amazon ("Shops from Amazon.com") and Fulfillment by Merchant

14   ("Ships from PConline 365"). The price offered is identical, but the free shipping offered by the

15

16

17

18

19

20

21

22

23

24

25

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   Seller is 3 days *faster* than Amazon's shipping. Nonetheless, the item that won the Buy Box is the

2   one that was warehoused and shipped by Amazon:



14   121.   Some of the biggest price differences appear when an item is *not* sold by Amazon,

15   but by two Sellers—a Seller that handles its own shipping and a Seller that pays for Fulfillment

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    services and therefore wins the Buy Box. In the following example, the Seller that is paying for

2    FBA won the Buy Box, even though the other Seller's price was $20.01—or 25%—lower:



122.    While the delivery-time estimates do vary for the two Sellers in the above example,

the only obvious reasons for Amazon's algorithm placing the item that is 25% more expensive in

the Buy Box are (i) to ensure that the sale goes to the Seller who pays for Amazon's Fulfillment

Services and (ii) to get higher referral fees from the sale. Given that Sellers pay Amazon 15% of

the sale price for any item in the "Kitchen" category, Amazon would earn $3.90 more in referral

fees if the consumer purchase the item from the FBA Seller.[104]

---

[104] $0.15 \times (\$80 - \$54) = \$3.90$.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**2.    The Buy Box algorithm's preference for Sellers who purchase Amazon's Fulfillment services decreases price competition among Sellers, resulting in consumers paying higher prices than they would have but for Amazon's unlawful tying arrangement.**

123.    The Buy Box algorithm presents the consumer with an offer from a Seller who pays for Fulfillment by Amazon, even if another Seller with faster (non-FBA) shipping is selling the same item for a lower price.

124.    In this way, Amazon has intentionally designed its algorithm to force Sellers to purchase the company's Fulfillment services or risk going out of business, as 90% of the purchases on Amacon.com are made through the Buy Box.

125.    Amazon's design of the Buy Box algorithm leads directly to a decrease in price competition, given that the vast majority—73%—of Sellers use Amazon's Fulfillment services.

126.    With 73% of Sellers assured that they will win the Buy Box based on their paying for Fulfillment by Amazon *even if a non-FBA Seller is offering a lower price and faster delivery*, the incentive to compete based on price is greatly reduced.

127.    Because there is less price competition among FBA Sellers, the prices for items featured in the Buy Box are higher than they would be but for Amazon's scheme to expand its logistics business by forcing Sellers to use its Fulfillment services.

**3.    Sellers pass on the supra-competitive cost of Fulfillment by Amazon to consumers in the form of higher prices.**

128.    Sellers who purchase Amazon Fulfillment services to win the Buy Box are able to—and do—charge higher prices than they would but for Amazon's anticompetitive conduct.

129.    A fundamental principle of economics is that a business will increase the price of a product if it can do so without decreasing demand for the product. For several reasons, the price

CLASS ACTION COMPLAINT - 40

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   of items sold through Amazon.com is relatively inelastic, meaning (among other things) that an

2   increase in price does not lower demand.

3       130.    As explained in the House Subcommittee's Report, Prime members—who account

4   for the vast majority of sales on Amazon.com[105]—are relatively insensitive to increases in price:

5       Once Prime members pay the upfront annual membership fee, they are

6       likely to concentrate their online purchases with Amazon . . . . As one
    market participant observed, "Prime members will continue to use Amazon

7       and not switch to competing platforms, ***despite higher prices and lower-
    quality items on Amazon*** compared to other marketplaces, ***and despite***

8       ***recent increases in the price of a Prime membership***."[106]

9       131.    Higher prices also are unlikely to prompt Amazon's customers to shop elsewhere

10  given the "switching costs associated with consumers shopping outside of the Amazon

11  ecosystem."[107]

12      132.    Accordingly, the ever-increasing fees that Sellers are charged by Amazon—

13  including fees for Amazon's Fulfillment services—are "being absorbed by consumers in the form

14  of higher prices."[108]   Because Prime member purchasers are relatively insensitive to price

15

16

---

17  [105] Most people who purchase items through Amazon are Amazon Prime members, *see*
    Sabanoglu, *Number of Amazon Prime users in the United States from 2017 to 2022, supra*

18  note 51 (showing that there were 142.5 million Prime members in United States in 2020), and
    Prime members also account for the vast majority of sales through Amazon, "spend[ing] an

19  average of $1,400 annually on Amazon, versus $600 [spent annually by] non-members." House
    Subcommittee Report, *supra* note 8, at 260.

20  [106] House Subcommittee Report, *supra* note 8, at 260 (emphasis added); *see also* Fishman,
    *Amazon, the Price Perception Leader, supra* note 53 ("Amazon loyalists shop on Amazon.com

21  trusting that they are getting a bargain. . . . [I]t's this perception of low pricing that helps make
    shopping on Amazon almost instinctual to many consumers. It's this perception that keeps

22  Amazon shoppers from checking other sites for lower pricing before hitting the 'Place Your
    Order' button. It makes retail shoppers check their Amazon app before heading to the register.

23  It's enough to convince folks to make purchases with just an Alexa voice command or a Dash
    button-push without concern for how little visibility they have into actual market pricing.").

24  [107] House Subcommittee Report, *supra* note 8, at 260.
    [108] Mitchell, et al., *Amazon's Monopoly Tollbooth, supra* note 32, at 6.

25

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   increases, Sellers can and do pass on the cost of Amazon's Fulfillment services instead of, for

2   example, absorbing the increased costs through lower profit margins.

3       133.    Sellers themselves report that they have to increase their prices because of the fees

4   charged by Amazon. In one thread on the Amazon Services Seller Forum, titled "Items are priced

5   higher on Amazon than at other retailers," an Amazon Seller wrote: "On Amazon we can control

6   our pricing and **we build in all amazon fees**. Therefore after all fees we charge a certain price

7   based on percentage."[109]

8       134.    Another Seller on the same thread wrote: "[I]f they [Amazon] want to have the

9   highest fees on the internet for 3rd party sellers, they are also going to be the least likely place to

10  find the best deal. If they brought their fees down to be in line with the other platforms like eBay,

11  they'd be more likely to at least have price parity with other platforms."[110]

12      135.    A third Seller likewise confirmed that Amazon Sellers charge consumers more

13  because of the high fees imposed by Amazon:[111]

14

15  

16

17

18

19

20  [109] Post by Seller plastic-gur, *Items are priced higher on Amazon than at other retailers*,
    AMAZON SERVICES SELLER FORUM (Apr. 3, 2019), https://sellercentral.amazon.com/forums/t/
21  items-are-priced-higher-on-amazon-than-at-other-retailers/450662.
    [110] Post by Seller AudioFan, *Items are priced higher on Amazon than at other retailers*, AMAZON
22  SERVICES SELLER FORUM (Apr. 3, 2019), https://sellercentral.amazon.com/forums/t/items-are-
    priced-higher-on-amazon-than-at-other-retailers/450662.
23  [111] Post by Seller OMP, *Items are priced higher on Amazon than at other retailers*, AMAZON
    SERVICES SELLER FORUM (Apr. 4, 2019), https://sellercentral.amazon.com/forums/t/items-are-
24  priced-higher-on-amazon-than-at-other-retailers/450662.

25

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

**4.**     **FBA Sellers' charging consumers higher prices enables Amazon to do the same.**

2

3     136.     Because many items on Amazon's website are sold by both Amazon and its Sellers,

4     the Sellers' increasing prices to offset the supra-competitive cost of Fulfillment services enables

5     Amazon to charge higher prices on items that are identical (or comparable) to those sold by FBA

6     Sellers.

7     137.     As with Sellers, one factor that enables Amazon to increase its prices is that the

8     price of items sold on Amazon.com—and especially through the Buy Box—is very inelastic, in

9     large part due to the (often misplaced) brand loyalty of Amazon shoppers.

10     138.     Amazon uses algorithms to price its items. The company "changes product prices

11     2.5 million times a day," based on its analyses of "customer's shopping patterns, competitors'

12     prices, profit margins, inventory, and a dizzying array of other factors."[112] One of Amazon's

13     principal pricing strategies is to "undercut [its] competitors [i.e., Sellers] on popular products."[113]

14     139.     This means that, when a Seller raises the price of a product to offset the

15     supra-competitive fees it pays for Amazon's Fulfillment services, Amazon's algorithm has room

16     to raise Amazon's prices while still undercutting the Seller.

17     140.     Thus, the consumer is being overcharged regardless of whether the consumer

18     purchases the item from Amazon or the Seller.

19     **D.     Amazon's Reign of Terror Over Sellers**

20     141.     Although countless Sellers are injured by Amazon's unlawful tying scheme, the

21     vast majority of them passively accept Amazon's flagrant violation of the antitrust laws. There are

22

---

23     [112] Neel Mehta, Parth Detroja & Aditya Agashe, *Amazon changes prices on its products about every 10 minutes — here's how and why they do it*, BUSINESS INSIDER (Aug. 10, 2018), https://www.businessinsider.com/amazon-price-changes-2018-8?op=1.

24     [113] *Id.*

25

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  two reasons for this: (i) Sellers fear retaliation by Amazon and (ii) the onerous contract terms

2  imposed on Sellers by Amazon quash any incentive to challenge Amazon's anticompetitive

3  actions.

4       142.   As one market participant told the House Subcommittee: "It would be commercial

5  suicide to be in Amazon's crosshairs . . . If Amazon saw us criticizing, I have no doubt they would

6  remove our access and destroy our business."[114] As the House Subcommittee Report notes, a

7  "single tweak of an algorithm" by a platform like Amazon "could cause significant costs if not

8  financial disaster—with little recourse."[115]

9       143.   Sellers' fears are well founded. Amazon has a long history of retaliating "to coerce

10 publishers to accept contractual terms that impose substantial penalties for promoting competition

11 with Amazon's rivals."[116]

12      144.   Amazon has retaliated against book publishers by, among other things,

13 (i) "removing the 'buy' button, which blocks a customer's ability to purchase a publisher's current

14 titles," (ii) "removing the 'pre-order' button, which eliminates the ability for a consumer to pre-

15 order a publishers' forthcoming titles," and (iii) "showing publishers' titles as out of stock or with

16 delayed shipping times."[117]

17      145.   As the House Subcommittee Report succinctly puts it, "Amazon can treat sellers in

18 this manner because it knows that sellers have no other realistic alternatives to the platform."[118]

19

20

21

22 [114] House Subcommittee Report, *supra* note 8, at 74 (internal quotation marks omitted).
   [115] House Subcommittee Report, *supra* note 8, at 74.

23 [116] House Subcommittee Report, *supra* note 8, at 269 (internal quotation marks omitted).
   [117] House Subcommittee Report, *supra* note 8, at 269.

24 [118] House Subcommittee Report, *supra* note 8, at 269.

25

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   146.    Even those Sellers who are willing to risk taking on Amazon are effectively

2   precluded from doing so by the arbitration clauses they are required to sign to obtain access to the

3   online retail market through Amazon.[119]

4   147.    Whereas filing fees in federal court are a few hundred dollars, the total

5   "administrative fees" for a Seller filing an arbitration claim against Amazon range from $1,725[120]

6   for claims of less than $75,000 to as high as $78,750 for claims of $10 million and above.[121]

7   148.    Even worse, under Amazon's "Services Business Solutions Agreement," Sellers

8   who are injured by Amazon's tying arrangement or retaliatory conduct cannot recover the full

9

10

11

12

13

14

15

16

17

18

19   _____

[119] *See* House Subcommittee Report, *supra* note 8, at 273.

20   [120] *See AAA's Commercial Arbitration Rules and Mediation Procedures: Fee Schedule*
[hereinafter *AAA Fee Schedule*] (May 1, 2018), available at http://www.adr.org/sites/default/

21   files/Commercial_Arbitration_Fee_Schedule_1.pdf; *Amazon Services Business Solutions
Agreement*, AMAZON, at ¶ 18 (last visited Mar. 22, 2021) (providing that arbitration is to "be

22   conducted by the American Arbitration Association (AAA) under its commercial rules"),
https://sellercentral.amazon.com/gp/help/external/1791?language=en-US. This includes a $925

23   initial filing fee plus $800 final fee. *See AAA Fee Schedule.*

[121] This includes an initial filing fee of $11,000 plus .01% of the claim amount above

24   $10,000,000 up to $65,000, *plus* a final fee of $13,750. *See AAA Fee Schedule, supra* note 120.

25

CLASS ACTION COMPLAINT - 45

1  amount of those injuries because the Agreement essentially eliminates Amazon's liability for *any*

2  injury it inflicts on a Seller:[122]

3

4  > **8. Limitation of Liability.**
   >
   > We WILL NOT BE LIABLE (WHETHER IN CONTRACT, WARRANTY, TORT

5  > (INCLUDING NEGLIGENCE, PRODUCT LIABILITY, OR OTHER THEORY), OR
   > OTHERWISE) TO YOU OR ANY OTHER PERSON FOR COST OF COVER,

6  > RECOVERY, OR RECOUPMENT OF ANY INVESTMENT MADE BY YOU OR
   > YOUR AFFILIATES IN CONNECTION WITH THIS AGREEMENT, OR FOR ANY

7  > LOSS OF PROFIT, REVENUE, BUSINESS, OR DATA OR PUNITIVE OR
   > CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS

8  > AGREEMENT, EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY
   > OF THOSE COSTS OR DAMAGES. FURTHER, OUR AGGREGATE LIABILITY

9  > ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE
   > TRANSACTIONS CONTEMPLATED WILL NOT EXCEED AT ANY TIME THE

10 > TOTAL AMOUNTS DURING THE PRIOR SIX MONTH PERIOD PAID BY YOU
   > TO AMAZON IN CONNECTION WITH THE PARTICULAR SERVICE GIVING

11 > RISE TO THE CLAIM.

12

13      149.    The onerous terms of Amazon's Agreement with its Sellers make clear why "sellers

14 rarely initiate arbitration actions against Amazon":[123]

15      > Between 2014 and 2019, even as the number of Amazon sellers continued
        > to grow by hundreds of thousands per year, only 163 sellers and 16 vendors

16      > initiated arbitration proceedings. Because sellers are generally aware that
        > the process is unfair and unlikely to result in a meaningful remedy, they

17      > have little incentive to bring an action.[124]

18                          **CLASS ACTION ALLEGATIONS**

19      150.    Plaintiff brings this action on behalf of herself and, under Federal Rule of Civil

20 Procedure 23(a), (b)(2), and (b)(3), as representatives of a Class defined as follows:

21      > All persons who, while residing in the United States, purchased an item
        > during the Relevant Period through Amazon's Buy Box, and the order was

22      > then shipped (or "fulfilled") by Amazon.

---

23 [122] *Amazon Services Business Solutions Agreement, supra* note 144.
24 [123] House Subcommittee Report, *supra* note 8, at 273.
   [124] House Subcommittee Report, *supra* note 8, at 273.

25

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

151.    For purposes of this Complaint, the Relevant Period is January 1, 2013 through the present.

152.    Excluded from the Class are Defendant Amazon and any entity in which Defendant has a controlling interest, as well as any of Defendant's legal representatives, officers, directors, assignees, and successors.

153.    Members of the Class are so numerous that joinder of all Class Members is impractical. Currently, there are more than 140 million Amazon Prime members in the United States who spend an average of $1,400 annually on the website. Likewise there are millions of Amazon shoppers without a Prime membership who spend an average of $600 annually on the website. Given that 90% of purchases on Amazon's website are made through the box, a conservative estimate is that there are at least 135 million Class Members. Class Members are readily identifiable from information and records in Amazon's possession.

154.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and Class Members were aggrieved by the same wrongful conduct of Amazon: Amazon's tying arrangement steered consumers toward Sellers who paid for Amazon's Fulfillment services, even when the total price charged by those Sellers was higher than that of Sellers who did not use FBA. Amazon's tying arrangement further led to Sellers increasing prices to offset the supra-competitive costs of FBA and to Amazon itself raising prices.

155.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the Class.

156.    Plaintiff is represented by counsel with experience in the prosecution of class actions and with particular experience with antitrust class actions.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

157.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Amazon has acted on grounds generally applicable to the entire Class, thereby making damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Amazon's wrongful actions.

158.    Questions of law and fact common to the Class include:

 a. Whether Amazon conditions Sellers' access to the Buy Box on their purchasing Fulfillment services from Amazon.

 b. Whether Amazon has significant market power over the Buy Box.

 c. Whether Amazon has significant market power over e-commerce generally.

 d. Whether Amazon used its market power to force Sellers to purchase Amazon's Fulfillment services.

 e. Whether Amazon's conduct is a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and if so, whether it is a *per se* violation.

 f. Whether Amazon has monopoly power in the U.S. online retail-goods market or the market for favorable Seller placement on the Amazon website (e.g., the Buy Box).

 g. Whether Amazon used its monopoly power to foreclose competition, to gain advantage, or to destroy competitors in the market for logistics—the warehousing, packing, and shipping of retail goods to consumers.

 h. Whether Amazon's conduct is a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

i.  Whether Fulfillment by Amazon was more or less expensive during the relevant period than other logistics services that Sellers could have used to warehouse and ship their products.

j.  Whether Fulfillment by Amazon offered faster delivery times during the relevant period than other logistics services that Sellers could have used to warehouse and ship their products.

k.  Whether Sellers' prices were and are higher than they would have been but for Amazon's anticompetitive conduct.

l.  Whether Amazon's prices were and are higher than they would have been but for Amazon's conditioning Sellers' access to the Buy Box on their purchasing Fulfillment services from Amazon.

m.  Whether Class Members were harmed by paying higher prices for items purchased on Amazon's website than they would have but for Amazon's anticompetitive conduct.

n.  Whether Amazon should be enjoined from conditioning Sellers' access to the Buy Box on their purchasing Fulfillment services from Amazon.

159.  Class-action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

160.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

**A.     Discovery-Rule Tolling**

161.     The discovery rule tolls the running of the statute of limitations until a plaintiff knows or has reason to know of the injury which is the basis of the action.

162.     The discovery rule tolled the statute of limitations in this case until at least November 8, 2019, when major news outlets reported that a Seller had sent a letter to federal lawmakers, "accus[ing] Amazon of forcing him and other sellers to use the company's expensive logistics services, which in turn forces them to raise prices for consumers."[125]

163.     Although it previously had been reported that Sellers could increase their chances of "winning" the Buy Box by paying for Fulfillment by Amazon, neither Plaintiff nor other consumers had any reason to read articles about winning Amazon's Buy Box.

164.     More importantly, even consumers who may have read an article before November 2019 about the Buy Box algorithm did not know or have reason to know of the injury—higher prices for Buy Box items—that is the basis of this action. Knowing of this injury would have required a consumer to have understanding or knowledge of, among other things: (i) economics, (ii) Amazon's business model, (iii) the operation of Amazon's Buy Box algorithm, (iv) Amazon's charging Sellers more for its Fulfillment services than competing logistics companies who offered comparable or better logistics services, and (v) that Sellers were able to pass the cost of Amazon's overprices Fulfillment services on to consumers.

---

[125] *See, e.g.*, Soper, *Amazon Accused of Forcing Up Prices*, *supra* note 25.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

165.    Plaintiff and Class Members could not have reasonably discovered their injury until a Seller came forward in November 2019 to alert lawmakers that Amazon's tying arrangement was leading to higher prices for consumers.

166.    For the above reasons, the applicable statute of limitations has been tolled by operation of the discovery rule.

**B.      Fraudulent-Concealment Tolling**

167.    The applicable statute of limitations also has been tolled by Amazon's fraudulent concealment throughout the period relevant to this action of the fact that its tying scheme was leading to higher prices for consumers who made purchases through the Buy Box.

168.    Throughout the relevant period, Amazon's CEO Jeff Bezos made numerous public statements about Amazon's prices that constitute affirmative acts to mislead the public.

169.    This is evidenced by Bezos's annual letters to shareholders, which regularly touted Amazon's commitment to "relentlessly lowering prices":[126]

> (i)      2002: "People see that we're determined to offer both world-leading customer experience and the **lowest possible prices** … . Our pricing objective is not to discount a small number of products for a limited period of time, but to offer **low prices everyday** and apply them broadly across our entire product range."[127]

> (ii)     2003: "Eliminating defects, improving productivity, and passing the resulting cost savings back to customers in the form of **lower prices** is a long-term decision."[128]

> (iii)    2005: "[W]e have made a decision **to continuously and significantly lower prices for customers year after year** as our efficiency and scale make it possible. … Our judgment is that relentlessly returning efficiency improvements and scale economies to customers **in the form of lower prices** creates a

---

[126] Jeff Bezos, *Letters to Amazon Shareholders, 1997 to 2020*, (emphasis added), *available at* https://bettertomorrowfinancial.com/wp-content/uploads/2021/04/jeff-bezos-amazon-shareholder-letters-1997_2020.pdf.

[127] *Id.* (emphasis added)

[128] *Id.* (emphasis added).

CLASS ACTION COMPLAINT - 51

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  virtuous cycle that leads over the long term to a much larger dollar
2  amount of free cash flow, and thereby to a much more valuable
   Amazon.com."[129]

3  (iv)  2008: "Our pricing objective is to earn customer trust, not to
       optimize short-term profit dollars. We take it as an article of faith
4       that pricing in this manner is the best way to grow our aggregate
       profit dollars over the long term. We may make less per item, but
5       by consistently earning trust we will sell many more items.
       Therefore, **we offer low prices across our entire product**
6      **range**."[130]

7  (v)  2009: "The financial results for 2009 reflect the cumulative effect
      of 15 years of customer experience improvements: increasing
8      selection, speeding delivery, reducing cost structure so **we can**
      **afford to offer customers ever-lower prices**, and many others. …
9      We are proud of our low prices … ."[131]

10  (vi)  2012: "**We lower prices and increase value for customers** before
       we have to."[132]

11  (vii)  2015: "Our approach to pricing is also driven by our customer-
12       centric culture—**we've dropped prices 51 times**, in many cases
        before there was any competitive pressure to do so."[133]

13  (viii)  2020: "We offer **low prices**, vast selection, and fast
14       delivery … ."[134]

15   170.  Over the past 20 years, Bezos's message (Amazon is determined to offer the lowest

16  possible prices!) has been relentlessly amplified by advertising and the news media.

17   171.  In short, Amazon deliberately hoodwinked the public into believing that it was

18  continuously laboring away to keep down prices by any means necessary. The statute of limitations

19  is therefore tolled by Amazon's fraudulently concealing the overcharges incurred by consumers as

20  a result of the company's tying scheme.

21
   ---
   [129] *Id.* (emphasis added).
22  [130] *Id.* (emphasis added).
   [131] *Id.* (emphasis added).
23  [132] *Id.* (emphasis added).
   [133] *Id.* (emphasis added).
24  [134] *Id.* (emphasis added).

25

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## CLAIMS FOR RELIEF

### Claim 1: Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) – Unlawful Tying Arrangement

172.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

173.    Amazon's tying arrangement is a *per se* violation of 15 U.S.C. § 1.[135]

174.    Amazon offered Sellers two distinct products or services in two different markets:

(i)    **the tying product**, namely placement in the Buy Box, which is a product or service in the market for favorable product placement on Amazon's website, and on the internet more broadly; and

(ii)    **the tied product**, namely Fulfillment by Amazon, which is a service in the market for logistics for retail goods in the United States—namely, the warehousing, packing, and shipping of retail goods.

175.    Amazon possesses appreciable economic power in the market for favorable product placement on Amazon's website (including placement in the Buy Box) and in the market for favorable product placement on the internet generally.

---

[135] *See, e.g.*, *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 n.7 (9th Cir. 2012) ("A tying arrangement will constitute a per se violation of the Sherman Act if the plaintiff proves (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." (citations and internal quotation marks omitted)); *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 316 (7th Cir. 2006) ("In order to establish the per se illegality of a tying arrangement, a plaintiff must show that: (1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected." (citations omitted)).

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

176.     Amazon's economic power in the market for favorable placement on Amazon's website (the tying product)—and in the market for favorable product placement in e-commerce more broadly—was and is sufficient to coerce Sellers to purchase Amazon's Fulfillment services (the tied product). The livelihoods of the majority of Sellers depends on sales made through Amazon's website. Sellers knew that if they did not agree to purchase Amazon's Fulfillment services, their livelihoods would be ruined, as they would not appear in the Buy Box or be prominently displayed in Amazon's search results.

177.     Amazon's anticompetitive scheme affects a not-insubstantial volume of commerce in the product market for logistics. Approximately $163 billion products are sold through Amazon's website every year.[136] The majority of those products are shipped through Amazon's Fulfillment services. Amazon's anticompetitive conduct has decreased competition in the logistics market (the tied product market) and has put numerous competitors in that market out of business.

178.     Alternatively, even if Amazon's conduct is not a *per se* violation of Section 1, Amazon has violated Section 1 under the rule of reason because it has unreasonably restrained competition.

179.     Specifically, Amazon suppressed and continues to suppress competition in the market for logistics services inside the United States.[137] And there is a substantial threat that Amazon will acquire market power in that market. Amazon has overtaken the U.S. Postal Service in terms of number of parcels, "deliver[ing] 2.5 billion parcels [in 2019], or about one-fifth of all

---

[136] Carmen Ang, *Visualized: A Breakdown of Amazon's Revenue Model*, VISUAL CAPITALIST (Oct. 14, 2020), https://www.visualcapitalist.com/amazon-revenue-model-2020/.

[137] *See generally* Zvi Schreiber, *How Logistics Is Proving that Amazon Needs to Be Regulated*, FREIGHTOS (May 14, 2019) ("Amazon is taking its dominance from retail to marketplace to fulfillment logistics. And now it's going further into shipping, using its advantages to offer freight and shipping."), https://www.freightos.com/how-logistics-is-proving-that-amazon-needs-to-be-regulated/

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

e-commerce deliveries."[138] One analysis anticipates that Amazon will "overtake UPS and FedEx in market share by 2022."[139]

180.    Moreover, favorable placement of a product on Amazon's website—and in e-commerce more broadly—is completely distinct from logistics services. The two products or services cannot and should not be viewed as one.

181.    Amazon's unlawful tying arrangement has injured Plaintiff and Class Members by directly leading to higher prices for items that Plaintiff and Class Members purchased through Amazon's Buy Box.

### Claim 2: Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) – Use of Monopoly Level of Power to Harm Competition Through Tying Scheme

182.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

183.    Amazon has violated 15 U.S.C. § 2 by using its monopoly level of market power in one or more markets to foreclose competition, gain a competitive advantage, or destroy a competitor in a different market.[140]

184.    Amazon has a monopoly level of market power in two markets (the tying-product markets): (i) the market for favorable placement on the Amazon retail website (e.g., placement in the Buy Box), over which it has complete control, and (ii) the online retail market in the United States, in which Amazon controls about 65% to 70% of all marketplace sales.

---

[138] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 2.
[139] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 2.
[140] *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 480–86 (1992) (stating that two elements of a Section 2 claim in tying context are (i) "possession of monopoly power in the relevant market" and (ii) the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor" (citations and internal quotation marks omitted)).)

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

185.    Amazon used its power in one or both these markets to foreclose competition, to gain a competitive advantage, or to destroy competitors in the United States market for logistics services for retail goods (the tied-product market)—namely, the warehousing, packing, and shipping of retail goods.

186.    By tying a Seller's access to the Buy Box to a Seller's purchasing FBA, Amazon has used its monopoly level of power to force many Sellers who would otherwise prefer a different logistics provider to instead pay for Amazon's Fulfillment services.

187.    This has undoubtedly provided Amazon a competitive edge in the market for logistics services for retail goods. As one Seller told the House Subcommittee, but for Amazon's linking Buy Box access to a Seller's use of its Fulfillment services, "they would not choose to use FBA, as they found Amazon's fulfillment service was often slower and less reliable than self-fulfillment."[141]

188.    A recent report analyzing Amazon's monopoly power succinctly summarizes Amazon's violation of Section 2:

> Amazon's exploitation of sellers is about more than extracting revenue from them. Amazon is also leveraging its dominance over sellers to gain market power in other sectors, furthering its monopoly strategy. Amazon has, for example, *compelled sellers to buy its warehousing and fulfillment services in order to get the kind positioning on its site that leads to sales*. Almost overnight *this move has catapulted Amazon to being a top logistics provider without having to compete for it*.[142]

189.    Amazon has leveraged its monopoly level of power in the realm of e-commerce to "overtake[ ] the U.S. Postal Service in the large e-commerce parcel market, and it's expected to surpass UPS and FedEx by 2022."[143]

---

[141] House Subcommittee Report, *supra* note 8, at 289–90.
[142] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 6.
[143] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 2.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

190.    "Thanks to its market power over sellers, Amazon's logistics operation now rivals the top carriers in scale. In 2019, Amazon delivered 2.5 billion parcels, or about one-fifth of all e-commerce deliveries."[144]

191.    Amazon's violation of Section 2 of the Sherman Act has injured Plaintiff and Class Members by directly leading to higher prices for items that Plaintiff and Class Members purchased through Amazon's Buy Box.

## **PRAYER FOR RELIEF**

192.    WHEREFORE, on behalf of herself and the Class, Plaintiff respectfully requests that this Court enter an Order:

a.    Certifying this case as a class action under Rule 23(a), (b)(2), and (b)(3) on behalf of the Class defined above, appointing Plaintiff Andrea Seberson as representative of the Class, and appointing her counsel as Class Counsel;

b.    Awarding Plaintiff and Class Members treble damages under 15 U.S.C. § 15(a);

c.    Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, among other things, an order requiring Amazon to cease its unlawful tying of access to the Buy Box to a Seller's purchase of Amazon Fulfillment services;

d.    Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

e.    Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

f.    Awarding such other and further relief as equity and justice may require.

---

[144] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

## JURY DEMAND

2

193.    Plaintiff demands a trial by jury on all issues so triable.

3

Dated: July 28, 2021

4                                          TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Beth E. Terrell, WSBA #26759
5          Beth E. Terrell, WSBA #26759
           Email: bterrell@terrellmarshall.com
6
By: /s/ Adrienne D. McEntee, WSBA #34061
7          Adrienne D. McEntee, WSBA #34061
           Email: amcentee@terrellmarshall.com
8          936 North 34th Street, Suite 300
           Seattle, Washington 98103-8869
9          Tel: (206) 816-6603
           Fax: (206) 319-5450
10
           Daniel E. Gustafson, *Pro Hac Vice forthcoming*
11         Email: dgustafson@gustafsongluek.com
           Daniel C. Hedlund, *Pro Hac Vice forthcoming*
12         Email: dhedlund@gustafsongluek.com
           Michelle J. Looby, *Pro Hac Vice forthcoming*
13         Email: mlooby@gustafsongluek.com
           Daniel J. Nordin, *Pro Hac Vice forthcoming*
14         Email: dnordin@gustafsongluek.com
           Mickey L. Stevens, *Pro Hac Vice forthcoming*
15         Email: mstevens@gustafsongluek.com
           GUSTAFSON GLUEK PLLC
16         Canadian Pacific Plaza
           120 South Sixth Street, Suite 2600
17         Minneapolis, MN 55402
           Tel: (612) 333-8844
18         Fax: (612) 339-6622

19

20

21

22

23

24

25

CLASS ACTION COMPLAINT - 58

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Brett Cebulash, *Pro Hac Vice forthcoming*
Email: bcebulash@tcllaw.com
Kevin Landau, *Pro Hac Vice forthcoming*
Email: klandau@tcllaw.com
Evan Rosin, *Pro Hac Vice forthcoming*
Email: erosin@tcllaw.com
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Tel: (212) 931-0704
Fax: (212) 931-0703

*Attorneys for Plaintiff and Proposed Class*

CLASS ACTION COMPLAINT - 59